Chief Magistrate Judge Brian A. Tsuchida

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. MJ19- 457 |
| Plaintiff, | |
| v. | COMPLAINT FOR VIOLATION OF 18 U.S.C. §1341 |
| ALLAN B. THOMAS and JOANN E. THOMAS, | |
| Defendants. | |

Before, the Honorable Brian A. Tsuchida, Chief United States Magistrate Judge, United States Courthouse, 700 Stewart Street, Seattle, Washington.

## COUNT 1
### (Mail Fraud)

Beginning in or before 2012, and continuing through on or after January 2, 2019, at Enumclaw, within the Western District of Washington, ALLAN B. THOMAS and JOANN E. THOMAS (collectively, the THOMASES), with the intent to defraud, devised and intended to devise, a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

//

//

A.   *Background*

1.      In Washington State, drainage districts are governmental entities; a type of special district established by the Revised Code of Washington.  Drainage districts are governed by three-person boards of commissioners, which are responsible for the construction and maintenance of drainage systems, including drains and ditches, within the district.  Each drainage district board is required annually to provide the county where it is located with an estimate of the cost of maintenance and repair for the district for the following year.  The county then uses the estimate to determine and assess each landowner's property taxes within the district.  After work is performed, the board of drainage district commissioners issues warrants to the treasurer of the county to pay for maintenance and repair work done on behalf of the drainage district.

B.   *The Essence of the Scheme and Artifice to Defraud*

2.      The object of the scheme was for ALLAN B. THOMAS and JOANN E. THOMAS to exploit ALLAN B. THOMAS' position as a commissioner for King County Drainage Districts 5 and 5A (collectively, "DD5") by:  (1) causing King County to levy taxes on DD5's residents; (2) submitting fraudulent warrants for a company controlled by ALLAN B. THOMAS and JOANN E. THOMAS and, later, a company that paid kickbacks to the THOMASES; and (3) diverting the taxpayer funds used to pay those warrants to the THOMASES' personal benefit.

C.   *The Manner and Means of the Scheme and Artifice to Defraud*

3.      It was part of the scheme and artifice that ALLAN B. THOMAS and JOANN E. THOMAS caused Alexander Thomas, ALLAN B. THOMAS' son, to register a business called A C Services with the State of Washington Department of Revenue.[1]

4.      It was further part of the scheme and artifice that JOANN E. THOMAS and Alexander Thomas opened a checking (and associated savings) account in the name of A C Services at White River Credit Union on which both JOANN E. THOMAS and Alexander

---

[1] The THOMASES also, at times, used the names "AC Services," "A CONSERVATION SERVICES," and "A. CONSERVATION SERVICES."

Thomas were authorized signers.  However, Alexander Thomas performed only two jobs for DD5 under the name of A C Services, both occurring in or about the year 2012, and otherwise had no involvement in the finances of A C Services.

5.      It was further part of the scheme and artifice that between 2012 and 2017, the THOMASES submitted approximately 36 fraudulent warrant requests to the King County Treasurer requesting the issuance of checks to pay for work projects supposedly done by A C Services on behalf of DD5.

6.      It was further part of the scheme and artifice that the THOMASES, despite issuing the warrants described above, knew that little to no work was performed on behalf of DD5 during this five-year period.

7.      It was further part of the scheme and artifice that, in submitting these fraudulent requests, the THOMASES knowingly misrepresented that work projects had taken place and that the checks requested from the King County Treasurer's Office were to pay for services purportedly rendered.

8.      It was further part of the scheme and artifice that the THOMASES deposited all of the King County checks made payable to "AC Services" into the A C Services bank account for which JOANN E. THOMAS was an authorized signer, with the exception of one check which was split between the A C Services bank account and the THOMASES' personal bank account.

9.      It was further part of the scheme and artifice that, after each check was deposited into the A C Services bank account, JOANN E. THOMAS transferred, withdrew, or paid the majority of the money from the account for the benefit of the THOMASES, including to support the operation of their dairy farm.

10.     It was further part of the scheme and artifice that, in 2018, after they became aware of an investigation of their actions, the THOMASES submitted two warrant requests to the King County Treasurer for the issuance of checks to pay for work projects supposedly done by an entity called City Biz on behalf of DD5.

COMPLAINT - 3
USAO# 2019R00457

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

11.     It was further part of the scheme and artifice that, within days after each check was deposited into a business bank account registered to City Biz, City Biz paid the majority of the money to ALLAN B. THOMAS directly or to the THOMASES' dairy farm.

12.     It was further part of the scheme and artifice that between 2012 and 2019 ALLAN B. THOMAS and JOANN E. THOMAS defrauded DD5 and the taxpayers residing in DD5 of $468,165 in payments to A C Services and City Biz.

D.      *Execution*

13.     On or about December 19, 2017, at Enumclaw, in the Western District of Washington, ALLAN B. THOMAS and JOANN E. THOMAS, for the purpose of executing the scheme and artifice described above, caused to be transmitted by means of United States Mail a check for $9,528.01 from the King County Treasurer's Office made out to "AC Services."

All in violation of Title 18, United States Code, Section 1341.

The undersigned complainant being duly sworn states:

1.      I, Matthew A. Thoresen, am a Special Agent of the Federal Bureau of Investigation (FBI), currently assigned to the Seattle Field Division.  I have been employed by the FBI for approximately 10 years, both domestically and internationally. The facts set forth in this Complaint are based on my own personal knowledge, including interviews I have conducted and my review of documents related to this investigation; information obtained from other individuals, including other law enforcement officers and investigators, during my investigation; and my review of reports from other law enforcement and civil agencies, including the Enumclaw Police Department ("EPD") and the Washington State Auditor's Office (the "Auditor's Office").

2.      I am the case agent responsible for an investigation of ALLAN B. THOMAS and his wife, JOANN E. THOMAS (collectively, "the THOMASES") involving their misappropriation of taxpayer monies for their personal gain, beginning in or before 2012, and continuing until in or after January 2019.

COMPLAINT - 4
USAO# 2019R00457

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

# I.   SUMMARY OF THE INVESTIGATION

3.      The FBI is conducting an investigation into fraudulent expenditures relating to King County Drainage Districts 5 and 5A (hereinafter, "DD5"), in King County, Washington.  Until recently, ALLAN B. THOMAS was a Commissioner for DD5 and JOANN E. THOMAS acted at times as the Secretary for DD5.  The investigation has revealed that the THOMASES caused Alexander Thomas, who is ALLAN B. THOMAS' son and JOANN E. THOMAS's stepson, to register an entity called A C Services with the State of Washington Department of Revenue that purportedly performed work on behalf of DD5.  In fact, Alexander Thomas performed only a limited amount of work for DD5 in approximately 2012.

4.      Between May 2012 and December 2017, however, the THOMASES submitted fraudulent requests for payments, totaling approximately $413,322, to the King County Treasurer for work that supposedly had been performed by A C Services on behalf of DD5, but that generally had not been performed.  Based upon these fraudulent requests, the King County Treasurer issued payments to A C Services using taxes assessed to all property owners in DD5.  The THOMASES, knowing little to no work had actually been performed, diverted the vast majority of these taxpayer funds to their own benefit.  After the Enumclaw City Attorney began questioning the THOMASES' conduct related to DD5 in November 2017, the THOMASES submitted two requests for payment to the King County Treasurer for work that supposedly had been performed by a company named City Biz.  After the King County Treasurer issued those payments, City Biz, within days, paid the majority of the money it received to the THOMASES.

# II.   THE INVESTIGATION

## A.   Background

5.      Chapter 85.06 of the Revised Code of Washington authorizes the establishment, and governs the operation, of drainage districts.  *See* RCW § 85.06.010 *et seq.* Drainage districts also fall within the definition of special districts set forth in Revised Code of Washington, Section 85.38.010(4), and therefore also are subject to the provisions of

Chapter 85.38 of the Revised Code of Washington. *Id.* § 85.38.010 *et seq*; *see also id.* § 85.06.015.   Drainage districts are governed by three-person boards of drainage commissioners, who are responsible for the construction and maintenance of drainage systems, including drains and ditches, designed to control and treat storm water, surface water, and flood water, within the district.   *Id.* §§ 85.06.010 85.06.080, 85.38.180(2).

6.     The three members of each drainage district board of commissioners are elected to staggered six-year terms.   *Id.* §§ 85.06.010, 85.06.080; 85.38.070(1), (4).   If only one person files for a position, however, he or she is considered to have been elected to that position, and no actual election need be held.   *Id.* § 85.38.115.   When a vacancy occurs on a board of commissioners, the legislative body of the county within which the district is located is to appoint a commissioner to serve until a successor is elected.   *Id.* § 85.38.070(5). A board of commissioners is required to elect one of its members as chairman, and to appoint a secretary (who need not be a commissioner).   *Id.* § 85.06.250.

7.     Each October, a board of drainage commissioners is required to provide the county auditor with an estimate of the cost of maintenance and repair for the drainage district for the ensuing year.   *Id.* § 85.05.270.   That amount then is assessed against the landowners within the district, and is collected as part of the landowners' property taxes.   *Id.*   A board of drainage commissioners issues warrants of such district, in payment of claims of indebtedness against the district.   *Id.* § 85.06.250.   The warrants are presented to the treasurer of the county in which the drainage district is located for payment.   *Id.*  §§ 85.06.250, 85.06.330.

8.     Drainage commissioners are entitled to compensation

> up to ninety dollars [adjusted for inflation since 2008] per day or portion thereof spent in actual attendance at official meetings of the district, or in performance of other official services or duties on behalf of the district:  PROVIDED, That such compensation shall not exceed eight thousand six hundred forty dollars [adjusted for inflation since 2008] in one calendar year: PROVIDED FURTHER, That such services and compensation are allowed and approved at a regular meeting of the board. . . .

COMPLAINT - 6
USAO# 2019R00457

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

*Id.* § 85.06.380; *see also id.* § 85.38.075.  In addition, each commissioner is entitled to reimbursement for "reasonable expenses actually incurred in connection with such business." *Id.*

**B.     The Investigation**

**1.     The THOMASES/Drainage District 5**

9.     During the relevant period, ALLAN B. THOMAS was a dairy farmer, who resided on his dairy farm in Enumclaw, Washington.  By his own account, ALLAN B. THOMAS served as a commissioner of DD5 for at least 35 years.  Kennet Olson served as a commissioner for DD5 for approximately seven years.  Both ALLAN B. THOMAS and Olson resigned as commissioners of DD5 in May 2019, after public attention was drawn to the investigations conducted by EPD and the Auditor's Office regarding the use of taxpayer funds paid to DD5.  The third position on the DD5 board of commissioners has been vacant for some period of time.  According to the King County Elections Department, no one – including ALLAN B. THOMAS and Olson – has filed as a candidate for any commissioner position for DD5 since at least 1986.  According to a letter written by ALLAN B. THOMAS and Olson, neither man stood for election, at least since that time, because there "never [were] enough candidates . . . to hold an election."  ALLAN B. THOMAS' and Olson's letter does not explain how either man originally assumed the position of commissioner for DD5.

10.     By 2010, ALLAN B. THOMAS was married to JOANN E. THOMAS, who was living with him in Enumclaw.  A driver's license of JOANN E. THOMAS, issued to her in 2010, lists her name as Joann Elaine Thomas.  In addition, I know from my investigation that, prior to marrying ALLAN B. THOMAS, JOANN E. THOMAS used the name Joann Copeland.  During the course of my investigation, I have seen documents that listed JOANN E. THOMAS as the Secretary of DD5.

11.     In 2010, Alexander Thomas, ALLAN B. THOMAS' son from a prior marriage, who was born in 1992, also lived at ALLAN B. THOMAS' residence in Enumclaw or in a mobile home located on the property.  On November 1, 2010, one or more of ALLAN B. THOMAS, JOANN E. THOMAS, and Alexander Thomas obtained a taxpayer

COMPLAINT - 7
USAO# 2019R00457

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  identification number from the Washington Department of Revenue for a business named A

2  C Services.[2]  A C Services was described as a sole proprietorship, owned by Alexander

3  Thomas, performing landscaping services.  The address provided for the business was an

4  address used for a mobile home located on ALLAN B. THOMAS's property.

5        12.     On May 29, 2012, JOANN E. THOMAS and Alexander Thomas opened a

6  checking (and associated savings) account at White River Credit Union in the name of A C

7  Services.  The account opening papers described A C Services as a sole proprietorship,

8  owned by Alexander Thomas, and engaged in "[a]griculture ([a]gribusiness)," located at the

9  same address that had been provided to the Washington Department of Revenue.  Although

10  the account opening papers described the business as a sole proprietorship, they stated that

11  the opening was authorized by the business' governing persons, listed as JOANN E.

12  THOMAS and Alexander Thomas.  The papers were signed by both JOANN E. THOMAS

13  and Alexander Thomas.  Both JOANN E. THOMAS and Alexander Thomas were made

14  authorized signers on the account, and only one person's signature was required to transact

15  business on the account.

16        13.     For each of the years 2012 through 2019, ALLAN B. THOMAS, as

17  commissioner of DD5, requested that a levy be assessed on the residents of DD5 in order to

18  fund repair and maintenance work in DD5.  For the years 2013 to 2017, ALLAN B.

19  THOMAS requested that King County levy a total of $75,000 in taxes.  ALLAN B.

20  THOMAS increased the levy request to $80,000 for the year 2018.  The King County

21  Assessor's Office assessed and collected the amounts ALLAN B. THOMAS requested for

22  each of these years from DD5 residents.

23        14.     Between 2012 and 2019, JOANN E. THOMAS acted as the primary contact

24  for DD5 with the King County Treasurer.  JOANN E. THOMAS regularly submitted

25  requests, including Special District Voucher Approval Documents that indicated that they

26  had been prepared by JOANN E. THOMAS and were certified to, and signed by, ALLAN B.

27

28
---
[2] The A C Services account with the Department of Revenue subsequently was closed on June 30, 2013.

COMPLAINT - 8
USAO# 2019R00457

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

THOMAS and, purportedly, Olson,[3] to the King County Treasurer requesting the issuance of checks to pay for services supposedly performed by vendors on behalf of DD5.  My review of these requests shows that most or all of the requests were sent from the e-mail address j********thomas@yahoo.com, which I believe to be one of JOANN E. THOMAS' e-mail addresses because the name of the account includes a variant of JOANN E. THOMAS' name. The accompanying e-mail correspondence often was signed "Jo Ann Thomas" or "Jo Ann Thomas, dd5."

15.     Many of the e-mail responses from the King County Treasurer to JOANN E. THOMAS noted that checks to vendors to pay for services supposedly rendered to DD5, which had been issued by the county in response to JOANN E. THOMAS' requests, would be mailed by United States mail to JOANN E. THOMAS.  For example, on May 11, 2013, a King County Treasury employee sent an e-mail to JOANN E. THOMAS stating, "this file has successfully processed, the warrants will be mailed on 11/03." I have interviewed a King County employee who has confirmed that all such checks were sent by United States mail.

**2.      The Beginning of the Investigation**

16.     In November 2017, the Enumclaw City Attorney submitted a public disclosure request to DD5 for the district's expenditure records relating to ditch maintenance.  In response, on November 7, 2017, ALLAN B. THOMAS sent the City Attorney a letter attaching a number of documents.  These included a document titled "CURRENT LIST OF DD5 CONTRACTORS/VENDORS."  That list included nine entities with names that suggest that they were involved, or could be involved, in the excavating or construction business – one of them was "A CONSERVATION SERVICES" - as well as two newspapers, and one law firm.

17.     The letter also attached a number of invoices from "A. CONSERVATION SERVICES," totaling more than $100,000, for work that supposedly had been performed in 2016 and 2017.  These invoices indicated that this business was located at an address in

---

[3] As described below, Olson denies signing the vast majority of these documents or authorizing anyone to sign them on his behalf.

COMPLAINT - 9
USAO# 2019R00457

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

Enumclaw, Washington, but was not the THOMASES' dairy farm.  The address appears to be a previous residence of JOANN E. THOMAS' parents.

18.     The descriptions of the work supposedly performed by "A. CONSERVATION SERVICES" were extremely general.  For example, one invoice described the work as "DITCH REPAIR/CLEAN UP ON MULTIPLE DITCHES WITHIN THE DISTRICT LATERAL A AND B."  Some of the invoices included an e-mail address ject****@gmail.com, which I believe, based on the initials "ject," which match JOANN E. THOMAS' first name, middle name, former surname, and current surname, to be another of JOANN E. THOMAS' e-mail addresses.  Finally, the letter attached two invoices and one statement, in a total amount less than $6,000, to DD5 from Jensen Sand & Gravel.

### 3.     Financial Analysis

19.     During its ensuing investigation, the Auditor's Office performed a financial analysis.  As part of its investigation, the FBI conducted an independent analysis which subsequently verified most, if not all, of the Auditor's office findings.[4]

20.     Through my review of banking records and reports prepared by the Auditor's Office, I determined that, between May 2012 and January 2019, King County issued checks totaling $500,510 to vendors in response to warrant requests submitted by DD5.  Of this amount, 36 payments, totaling $413,323 (that is, 83% of the total amount paid) were paid to "AC Services."  More than half of the remainder, $54,843, was paid to a new vendor, City Biz, in late 2018 and early 2019 (after the Enumclaw City Attorney had contacted DD5 to request records relating to the district's expenditures and EPD's investigation was underway).

//

//

//

---

[4] During its investigation, the FBI obtained the same bank and financial records that the Auditor's Office apparently obtained and analyzed.  However, as noted below, the FBI also obtained additional records that reflect additional misappropriation of taxpayer funds by the THOMASES.

21.     The $413,323 that was paid to "AC Services" was paid as follows:

| Year | Amount Paid |
|------|-------------|
| 2012 | $45,731.45 |
| 2013 | $70,888.19 |
| 2014 | $71,019.44 |
| 2015 | $77,722.49 |
| 2016 | $78,502.68 |
| 2017 | $69,458.30 |
| **Total** | **$413,322.55** |

The 36 individual checks issued by King County to "AC Services" listed the business' address as the address of the THOMASES' farm in Enumclaw, Washington, rather than the address provided to the Department of Revenue and White River Credit Union in 2010 and 2012 for A C Services.

22.     All of the King County checks to "AC Services" were deposited into the A C Services bank account at White River Credit Union,[5] with the exception of one check for which the deposit was split between A C Services bank account and ALLAN B. and JOANN E. THOMAS' personal bank account.  These funds constituted the overwhelming majority of the deposits into the A C Services account.  Shortly after each check (or in some cases two checks) were deposited into the account, almost all of the money was transferred, paid, or withdrawn from the account.  Thus, the balance in the account typically was reduced to less than $1,000, and often to less than $100, within a few days of the deposit.

23.     For example, in May 2016, the THOMASES submitted a request to King County for payment of $17,096.24 to "AC Services."  A May 6, 2016, invoice from "A. CONSERVATION SERVICES" states that this was for "CLEANING AND GRUBBING DD5 MAIN DITCTH 440th – 432nd AVE.  THIS INVOICE IS FOR WORK COMPLETED UPON APPROVAL AND INSPECTION BY COMMISSIONERS."  King County issued a check in the requested amount of $17,096.24, which was deposited into the A C Services

---

[5] On a number of occasions, checks were not deposited in full, as a portion of the total amount was immediately withdrawn as cash or deposited into accounts controlled by ALLAN B. THOMAS and JOANN E. THOMAS.

COMPLAINT - 11
USAO# 2019R00457

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

bank account at White River Credit Union on May 20, 2016.  Within six days, there were nine withdrawals or transfers from the account, which reduced the balance in the account to $19.85.

| Date | Transaction Detail | Amount | Balance |
|------|--------------------|--------|---------|
| 5/20/2016 | Deposit | $17.096.24 | $17,071.24 |
| 5/20/2016 | Withdrawal | ($3,000.00) | $14,071.24 |
| 5/23/2016 | Withdrawal | ($200.00) | $13,871.24 |
| 5/23/2016 | Transfer to ****6309-9-2 | ($1,500.00) | $12,371.24 |
| 5/23/2016 | Withdrawal - Check #43286 to Thomas Dairy | ($5,500.00) | $6,871.24 |
| 5/24/2016 | Withdrawal | ($531.39) | $6,339.85 |
| 5/24/2016 | Withdrawal | ($700.00) | $5,639.85 |
| 5/26/2016 | Transfer to ****6309-9 2 | ($620.00) | $5,019.85 |
| 5/26/2016 | Withdrawal - Check #43358 to QHC | ($4,000.00) | $1,019.85 |
| 5/26/2016 | Transfer to ****6309-9 2 | ($1,000.00) | $19.85 |

Significantly, account ****63909-9 2 is a joint account belonging to ALLAN B. THOMAS and JOANN E. THOMAS.  I know from my investigation that Thomas Dairy is the THOMASES' dairy farm.  And, I know from my investigation that QHC is a company that supplies hay.

24.     As noted above, the King County checks for work purportedly done by A C Services constituted the overwhelming majority of the money deposited into the A C Services account.  In fact, there were only $45,743 of other deposits between May 24, 2012 and February 22, 2018, and $35,912 of this amount was from Toppenish Livestock Commission, a livestock auction market that I believe is not involved in the business of maintaining drainage districts.  After this deposit, $35,900 was withdrawn in the form of transfers and checks for the benefit of ALLAN B. THOMAS and JOANN E. THOMAS in addition to $900 in cash withdrawals.

25.     I was able to trace the money paid by King County that was initially deposited into the A C Services account, along with monies received by the THOMASES from King

//

County through payments made to City Biz.  Specifically, the analysis showed the following misuse of funds received from King County:

| Use of Funds | Amount Paid |
|---|---|
| Cash withdrawals | $71,445 |
| Transfers/Checks to the THOMASES' personal bank account | $63,373 |
| Checks payable to hay suppliers | $128,678 |
| Checks payable to Thomas Dairy | $115,867 |
| Checks to pay the THOMASES' property taxes | $24,019 |
| Payments made to a residential lender for the THOMASES' residence | $13,181 |
| Checks from City Biz to the THOMASES' farm | $41,885 |
| **Total** | **$458,947** |

My analysis noted that JOANN E. THOMAS is listed as the person making all of the cash withdrawals from the A C Services account, and as the requestor for all of the cashier's checks written on the account.  In addition, JOANN E. THOMAS appears to have signed the vast majority of the checks written on the A C Services account.

26.     Thus, my investigation revealed that essentially all of the money that was paid by King County to "AC Services" and to City Biz was used to benefit ALLAN B. THOMAS and JOANN E. THOMAS and/or to support their dairy farm.  In aggregate, more than $160,000 of the money was withdrawn from the account in cash, transferred to ALLAN B. THOMAS and JOANN E. THOMAS' joint bank account, paid by check to ALLAN B. THOMAS or JOANN E. THOMAS, used to pay a loan on their personal real property and residence, or used to pay their property taxes; more than $165,000 of the money was paid by check to Thomas Dairy; and, more than $125,000 of the money was paid to hay suppliers, many of whom I know supplied hay to the THOMASES' farm.

27.     My investigation did not identify any payments made from the A C Services account that clearly related to any sort of drainage-ditch related work.   The Auditor's Office's analysis also noted that there were no sales tax payments made from the A C Services account to the Department of Revenue, although all of the "A. CONSERVATION SERVICES" invoices included (incorrectly-calculated) sales tax amounts.

COMPLAINT - 13
USAO# 2019R00457

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

28.     After the initial inquiry by the Enumclaw City Attorney in November 2017, JOANN E. THOMAS submitted two warrant requests to the King County Treasurer requesting the issuance of checks to pay for services supposedly performed by a new contractor named "City Biz."  The King County Treasurer issued checks to City Biz in response to JOANN E. THOMAS' request.  It is my understanding, that at this time, the King County Treasurer had begun refusing to pay warrants to AC Services given the ongoing investigation.

29.     The first invoice from City Biz was issued on October 8, 2018, for the amount of $22,156.00 with tax of $1,927.57, resulting in a payment total of $24,083.57.  King County issued a check to City Biz on October 30, 2018, in the amount of $24,083.57.  The check was deposited to a business checking account associated with City Biz on November 2, 2018.

30.     On November 2, 2018, the same date on which City Biz deposited the check from King County, the account owner withdrew a cashier's check in the amount of $20,760.00 payable to ALLAN B. THOMAS.  This check was deposited into the joint bank account of ALLAN B. THOMAS and JOANN E. THOMAS on the same day.

31.     The second invoice from City Biz was issued on January 2, 2019, for the amount of $27,296.57 with tax of $2,374.80, resulting in a payment total of $29,671.37. King County issued a check to City Biz on January 11, 2019 in the amount of $30,759.51.  It was deposited to the City Biz business checking account on January 14, 2019.

32.     On January 15, 2019, one day after City Biz deposited its second check from King County, the account owner withdrew a cashier's check in the amount of $21,125.00 payable to A & L Dairy. This check was deposited into an account controlled by ALLAN B. THOMAS and JOANN E. THOMAS on the same day.

**4.      Interview of ALLAN B. THOMAS and JOANN E. THOMAS**

33.     As part of its investigation, the Auditor's Office conducted a joint interview of ALLAN B. THOMAS, JOANN E. THOMAS, and Olson on April 11, 2019.  During the interview, ALLAN B. THOMAS stated that he and Olson did a lot of the district's work:

COMPLAINT - 14
USAO# 2019R00457

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

"[w]e can put a guy in an excavator for a couple hours . . . .  We can go find out things for ourselves so we don't have to spend money."  Olson stated that many of the district's priority ditches run across his own property, and that he cleans those.  Olson stated that the other smaller ditches were "on a more 7-9 year cleaning plan."  Olson stated that, every year the men did some excavation.  ALLAN B. THOMAS stated that "we kind of follow our paper work and the plan.  Usually a spring time and a fall time."

34.     During the interview, both ALLAN B. THOMAS and JOANN E. THOMAS implied that Alexander Thomas had performed the work on behalf of DD5 in the preceding years.  When asked about "A. CONSERVATION SERVICES," ALLAN B. THOMAS said that he had recruited Alexander Thomas "to show him how the real call for hard work was . . . [and] once we found out it was kind of legal to do a business with Alex, we put him into play. . . .   When we spoke with the County Assessor, he said it was legal to setup a business. The only thing he advised against was having people from the district have their wife doing the business or anybody that lived under the same roof as you.  Alex wasn't living under the same roof."

35.     ALLAN B. THOMAS said that Alexander Thomas generally ran the excavator, but that ALLAN B. THOMAS helped at times.  ALLAN B. THOMAS said that he, himself, stayed on the job site representing the district, and that he performed all necessary water sampling, so that they did not have to pay anyone else.  ALLAN B. THOMAS said that this continued until approximately two years ago [i.e. 2017], when Alexander Thomas supposedly sold his animals, and left town to join the Marines.

36.     When asked about the expenditures from the A C Services account, ALLAN B. THOMAS stated that "[s]ome of the hay things are for Alex's cows."  ALLAN B. THOMAS stated that he would have to go through his books to know what hay bills were "for us." When asked about the payment of property taxes, ALLAN B. THOMAS stated that the THOMASES were preparing for Alexander Thomas to take over the farm, and that "[w]hoever owns the farm pays the property taxes."

COMPLAINT - 15
USAO# 2019R00457

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

37.     When asked about cash withdrawals, ALLAN B. THOMAS stated that "[s]ome of the money that came back to Jo [JOANNE E. THOMAS] and myself is for when I would take care of some of Alex's business and he would reimburse us, for example fuel . . . [a]nd some of it could have been times I made Alex pay a little bit of rent on some of the equipment that he used that was from the farm." ALLAN B. THOMAS said that Alexander Thomas even had "his own fuel tank. . . .  Usually, Joann[] would pay the bill . . . and then he would reimburse us."

38.     JOANN E. THOMAS said "it could have been possible I got cash out for Alex . . . for incidentals or fuel or whatever."   JOANN E. THOMAS also said "any time money went into our personal account it was either for me to pay Alex's bills and things or it came from cash that I would give him." And, JOANN E. THOMAS stated "[i]f there were times I needed to pay something for him, which I have records of, . . . I would take care of some of his responsibilities."

39.     At the conclusion of the interview, ALLAN B. THOMAS stated "I can see where when you do family things it makes it rough," and that this was "an oh boy moment for [him]."  When asked whether the THOMASES had any records that supported their account, JOANN E. THOMAS stated that they did, and that these included "check register notes and other paperwork."

40.     After the THOMASES left the room, Olson told the Auditor's Office employees that he had not been involved in DD5's financial operations and had not previously been aware of the issues raised during the interview.  Olson also stated that Alexander Thomas had performed some work for the drainage district on Olson's own property, four or five years prior to the interview.  Olson also stated that Alexander Thomas had left town in 2016 or 2017.

**5.     Interviews of Alexander Thomas**

41.     As part of the investigations by the EPD, the Auditor's Office, and the FBI, Alexander Thomas has been interviewed multiple times.   Alexander Thomas' statements directly contradict much of THOMASES' version of events.

42.     Alexander Thomas stated that, in approximately 2012, after he completed high school, ALLAN B. THOMAS suggested that Alexander Thomas start a business to do work for DD5.  Alexander Thomas stated that his father and/or JOANN E. THOMAS picked the name A C Services or A. CONSERVATION SERVICES.  Alexander Thomas stated that JOANN E. THOMAS did the paperwork to register the business with Washington State, and that JOANN E. THOMAS and Alexander Thomas opened a business account at White River Credit Union.

43.     Alexander Thomas stated that he performed only two jobs for DD5, both in approximately 2012.  Alexander Thomas does not recall one of the jobs, but he recalls that the other involved cleaning a ditch and planting trees on Olson's property.  Alexander Thomas said that the money from this job was deposited into the A C Services' account and was used to make the down payment, and some subsequent payments, on a skid-steer tractor. Alexander Thomas stated that he did not like doing drainage ditch work, and that he has not done any work for A C Services since the two jobs that he recalls performing in approximately 2012.  Alexander Thomas added that he was never provided with any permits to provide any services for DD5.

44.     Alexander Thomas stated that, after stopping doing drainage district work, he continued to live on the THOMASES' dairy farm for several years.  He performed farm work, but was not paid a regular salary.  He lived in the mobile home and, later, a trailer on the property, and was fed by ALLAN B. THOMAS and JOANN E. THOMAS.  ALLAN B. THOMAS paid miscellaneous bills for him, such as his car-related bills and his phone bill, and gave him small amounts of cash.  Alexander Thomas stated that, eventually, he realized that his father was not going to give him the farm, and that, at some point between 2014 and 2016, he moved away from the farm and began working elsewhere.  In approximately 2018, Alexander Thomas joined the Army and moved away from the Enumclaw area.

45.     Alexander Thomas said that he did not deposit money into, withdraw money from, or write checks on the A C Services account at White River Credit Union.  Alexander Thomas was shown two checks written on the account that both appear to bear his signature:

check number 1025, written on December 2, 2017, to Marjorie Miller (who is JOANN E. THOMAS' mother) in the amount of $1,050; and check number 1026, written on December 11, 2017, to ALLAN B. THOMAS in the amount of $4,500.  Alexander Thomas stated that he had not signed either of the checks, and had not authorized anyone to sign his name to either check.[6]

46.     Alexander Thomas said that the only cows that he ever owned were three cows that he owned when he participated in 4H while in school.  Alexander Thomas said that the last of these died before he moved away from the farm.  Alexander Thomas said that he neither owned, nor sold, any other cows.  Alexander Thomas said that he did not have his own fuel tank at the farm.  Alexander Thomas said that he did not agree to pay for hay or property taxes for the farm, and that he did not agree to reimburse his father or JOANN E. THOMAS for any such expenses incurred on his behalf.  Alexander Thomas said that, when he moved away from the farm, he left the tractor that had been paid for, at least in part, by the money received from the job that he had done on Olson's property, at the farm.

47.     Alexander Thomas stated that, although he had seen his father perform work for the drainage district before 2012, he did not know his father to have performed any such work after the two jobs that Alexander Thomas performed in approximately 2012. Alexander Thomas also said that he was not aware that his father had hired anyone to perform work for the drainage district after 2012.

48.     Alexander Thomas stated that, since the investigation has begun, ALLAN B. THOMAS has told Alexander Thomas that, if the police contact Alexander Thomas, he should tell his father and should not talk to the police.  ALLAN B. THOMAS has told Alexander Thomas that they need to "stay together."  ALLAN B. THOMAS also has discussed getting a lawyer for Alexander Thomas.

//

---

[6] It appears that the THOMASES forged Alexander Thomas' signature on these checks after they became aware of the investigations by the Enumclaw City Attorney or Enumclaw Police Department.

COMPLAINT - 18
USAO# 2019R00457

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

### 6. Interview of Kennet Olson

49.      As part of the FBI's investigation, I conducted an interview of Kennet Olson. Olson's account suggests that much of the paperwork created by ALLAN B. THOMAS and JOANN E. THOMAS is false and fraudulent.

50.      Olson stated that, before he became a commissioner for DD5, he did not know much about the drainage districts.  Olson believed that he had more ditches on his property than any other property in DD5.  Approximately 20 to 25 years ago, the ditches were in disrepair, but at some point around that time they were cleaned out.  Olson did not recall any large projects being done on the ditches after that one.

51.      Olson recalled that ALLAN B. THOMAS asked him to become a commissioner.  Olson stated that ALLAN B. THOMAS told Olson that, to do the job of commissioner, Olson could just keep an eye on the ditches on Olson's own property.  Olson stated that ALLAN B. THOMAS told Olson that he would not be paid.  Olson stated that ALLAN B. THOMAS told Olson that, since no one else wanted the job, ALLAN B. THOMAS could just appoint Olson and there was no need for an election.

52.      Olson said that he did not know if ALLAN B. THOMAS hired contractors to clean ditches.  Olson said that he did not know if Alexander Thomas helped out cleaning ditches.  Olson said that he did not know where the tax monies that were assessed went to or what they were used for.  Olson said that he was not involved in the finances of DD5.  Olson stated that he could recall very informal meetings occurring once per year or less when he was first appointed as a commissioner.  Olson stated that these meetings to discuss DD5 were very informal and mostly occurred on the side of the road by ALLAN B. THOMAS' driveway or in the THOMASES' kitchen.

53.      Olson stated that there was some ditch work done on his property around 2012, but that he could not recall the exact year.  Olson stated that he was told by ALLAN B. THOMAS that Alexander Thomas had done the work.  Olson said that some of the ditches on his property were cleaned out and that "hundreds" of trees were planted.

COMPLAINT - 19
USAO# 2019R00457

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

54.     Olson said that he did not recall any other work being done, besides the work 20-25 years ago and the work on his property around 2012, until the investigation began. Olson said that he never saw ditch work being done around town, and that while there are areas where work could have been done without him seeing, most of the ditches in the district are on Olson's and ALLAN B. THOMAS' property.  Olson said that he never saw work being done on the main area of the ditches between 440th and 420th in Enumclaw, WA.

55.     Olson was shown a set of 11 separate invoices from "A. Conservation Services" which had previously been provided by DD5 to the Enumclaw City Attorney in response to his 2017 inquiry.  Olson said that he never approved any of the invoices or inspected any of the work referenced therein.  Olson said that, for bills of this size, he would have seen work being done as it would have occurred either on his property or within viewing distance of his property, but confirmed that he saw no such work being performed.

56.     Olson stated that the descriptions of the work completed on the aforementioned 11 invoices "look suspicious."  In reference to "INVOICE 41472", Olson stated that the work described was not done on the ditch between 440th and 432nd Avenues as that ditch is on his property.  Olson stated that there was not "$15,000 worth of work done there," referencing the approximate amount on the invoice.  Olson stated that despite some of the invoices describing work being done in the areas marked and designated as Lateral A, "those ditches were not cleared" and "$30,000 [for work performed] is way too much."

57.     Olson was shown a document containing 13 pages of separate "Special District Voucher Approval Document[s]" submitted to King County by DD5 for payment of contractors, each bearing purported signatures of ALLAN B. THOMAS and Olson.  Olson said that he did not recall signing any of the vouchers, did not know what the vouchers were and had never seen them before.  Olson said that the signatures that purportedly were his were not, in fact, his signatures (that is, they were forged).  Olson said that he did recall signing some type of vouchers after the investigation began in late 2017, but did not recognize any in this document.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

58.     Olson was shown documents from DD5 dated 2014 and 2015, each labeled as an "ANNUAL REPORT CERTIFICATION" and each including meeting minutes of supposed DD5 commissioner meetings from that year.  Olson said that he had never seen the packages or any meeting minutes, and noted that "they spelled my name wrong."  Although the 2014 minutes purported to reflect meetings at the THOMASES' farm, Olson's farm, and a McDonalds, Olson said that he "never met at McDonalds," as the meeting minutes suggested.  The minutes further purported to reflect discussions of work projects, motions to approve warrants, and a motion to approve a $75,000 levy on the district.  Olson stated that he never approved minutes, never discussed projects, and did not attend the meetings referenced in the minutes.  Olson stated that they never had any motions at any of the informal meetings he had with ALLAN B. THOMAS, that he never approved a $75,000 levy, and that he did not recall discussing computers being down (as referenced in the meeting minutes).  Olson said that "none of the things" mentioned in the minutes actually happened.

59.     Olson then stated that although the 2015 minutes purported to reflect meetings at the Olson farm and the THOMASES' farm, Olson never met at the THOMASES' farm in 2015 to discuss DD5 business.  Olson said that he discussed only farm business, not DD5 business, at the THOMASES' farm during this time period, not DD5 business, and that "nothing" in the minutes happened.  Olson stated that he did not sign the 2015 documents and that he never authorized anyone to sign his name to the documents, and noted that both his first and last names were misspelled in the documents.

60.     Olson was shown a document containing copies of a notebook recovered during the search of the THOMASES' residence.  The cover of this notebook is labeled "Drain dist 5 2018 2019".  The notebook begins with notes taken during the years of 2018 and 2019.  These notes are followed by an almost blank page, then by supposed handwritten minutes for seven purported meetings of DD5 commissioners during the year 2016.  Olson stated that he never attended any of the meetings referenced in the notes and that he did not

COMPLAINT - 21
USAO# 2019R00457

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

recognize the notebook itself.  Olson again stated that he did not review invoices or warrants referenced in the minutes.

61.    Olson stated that DD5's practices changed in approximately the past two years, after the investigation became known.  Olson said that these changes included JOANN E. THOMAS taking notes during meetings.  Olson said that in the past two years they had meetings just to have meetings and nothing was done.

**7.    Additional Investigation**

62.    As part of the FBI's investigation, another FBI Special Agent interviewed a number of residents of DD5 concerning whether they had observed work being done on drainage ditches.  Most had not seen any such work, and many noted that they had observed regular flooding of fields after rains.   One resident did say that he had seen ALLAN B. THOMAS working on a ditch or ditches "years ago."  Another said that he had observed that work had been done on a portion of a ditch that was located on the THOMASES' farm, and that the THOMASES' farm did have equipment (such as a backhoe and a dump truck) that could be used to work on drainage ditches.

**C.    The Search of the THOMASES' Residence**

63.    On July 19, 2019, other FBI Special Agents and I executed a search warrant to search the THOMASES' residence for evidence in this case.  ALLAN B. THOMAS and JOANN E. THOMAS were present at the residence.

64.    A search of the residence resulted in the seizure of numerous files and digital devices.  Much of this evidence has been reviewed, including the notebook described in Paragraph 60 above, financial records, communications with the King County Treasurer's Office, and numerous physical and electronic documents, including invoices from A C Services.  Other evidence remains to be reviewed.

//

//

COMPLAINT - 22
USAO# 2019R00457

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

65.     Based on the foregoing, I submit that probable cause exists to believe that ALLAN B. THOMAS and JOANN E. THOMAS have committed violations of Title 18, United States Code, Section 1341.

MATTHEW A. THORESEN
Special Agent
Federal Bureau of Investigation

The above-named agent provided a sworn statement attesting to the truth of these contents of the foregoing affidavit on 26th day of September, 2019.

BRIAN A. TSUCHIDA
Chief United States Magistrate Judge

COMPLAINT - 23
USAO# 2019R00457

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970